*Attorney Grievance Commission of Maryland v. Clifford Baer Silbiger*, Misc. Docket AG No. 57, September Term, 2020, Opinion by Booth, J.

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT**

Respondent Clifford Baer Silbiger violated the Maryland Attorneys' Rules of Professional Conduct 19-301.1 (Competence); 19-301.4 (Communication); 19-301.15 (Safekeeping Property); 19-308.1 (Bar Admission and Disciplinary Matters); 19-308.4(a)–(d) (Misconduct); Rule 19-407 (Attorney Trust Account Record-Keeping); Rule 19-408 (Commingling of Funds); Rule 19-410 (Prohibited Transactions); and the Business Occupations and Professions Article §10-306. Mr. Silbiger's violations arose from his misappropriation of client and third-party funds; failure to keep the required deposits and balances in his trust account; failure to create and maintain accurate and realistic records of his trust account; improperly commingling his funds with those in his attorney trust account in order to conceal his misconduct; performing prohibited transactions; making disbursements from his client's settlement funds without the client's knowledge; making cash disbursements; paying personal expenses from his attorney trust account client funds; initially, knowingly and intentionally holding back information and documentation requested by Bar Counsel; engaging in dishonest conduct; and engaging in conduct that is prejudicial to the administration of justice.

Considering the nature of Mr. Silbiger's misconduct and the various mitigating and aggravating factors present here, the Court of Appeals concluded that disbarment is the appropriate sanction.

Circuit Court for Carroll County
Case No.: C-06-CV-20-000424
Argued: March 4, 2022

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 57

September Term, 2020

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

CLIFFORD BAER SILBIGER

Watts
Hotten
Booth
Biran
Gould
Harrell, Glenn T., Jr.
  (Senior Judge, Specially Assigned)
McDonald, Robert N.
  (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.
Harrell, J., joins in judgment only.

Filed: May 26, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this case, we must determine the appropriate sanction to impose for an attorney's intentional misconduct in connection with activities in which he engaged related to his attorney trust account, including taking cash disbursements, commingling personal funds with client funds, paying personal expenses directly from his attorney trust account, and maintaining negative client-matter balances. The attorney, Respondent, Clifford Baer Silbiger, admits to borrowing funds from his attorney trust account to cover expenses related to his law firm—in essence, taking an interest-free loan from his client without her knowledge or consent. The only issue in dispute is the appropriate sanction to be imposed for the misconduct. Mr. Silbiger has proven considerable mitigating factors, including an unblemished professional record that spans 50 years and an excellent reputation in the legal community. And he asserts that no client or third party was harmed in connection with the misconduct. In fact, the client was likely not even aware that Mr. Silbiger borrowed from the funds held in trust, which Mr. Silbiger claims that he always intended to repay, and did indeed repay. For the reasons set forth herein, although we have considered the facts and circumstances presented in this case, we do not determine that the circumstances surrounding the misconduct justify a deviation from the sanction of disbarment that is ordinarily warranted when considering misconduct of this nature.

# I

## Background

### A. Procedural Context

On December 9, 2020, the Attorney Grievance Commission of Maryland ("Commission"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial

Action ("Petition") against Respondent, Clifford Baer Silbiger. The Petition alleged that Mr. Silbiger violated the Maryland Attorneys' Rules of Professional Conduct ("MARPC")[1] in connection with his representation of Shannon Johnson. Specifically, Bar Counsel charged Mr. Silbiger with violating MARPC 19-301.1 (Competence); 19-301.3 (Diligence); 19-301.4(a) and (b) (Communication); 19-301.15(a), (b), and (d) (Safekeeping Property); 19-308.1(b) (Bar Admission and Disciplinary Matters); 19-308.4 (a)–(d) (Misconduct); Maryland Rule 19-404 (Trust Account – Required Deposits)[2]; Maryland Rule 19-407(a)(2)–(d) (Attorney Trust Account Record-Keeping); Maryland Rule 19-408(a) (Commingling of Funds); Maryland Rule 19-410(a)–(c) (Prohibited Transactions); and Maryland Code, Business Occupations & Professions Article ("BOP"), § 10-306.

Pursuant to Maryland Rule 19-722(a), this Court transmitted the case to the Circuit Court for Carroll County and designated Senior Judge Louis A. Becker, III ("hearing judge") to conduct an evidentiary hearing and make findings of fact and conclusions of law. The hearing took place on July 7, 2021. Mr. Silbiger was represented by counsel throughout the hearing. Many of the facts of the case were stipulated to in a Joint Statement

---

[1] Effective July 1, 2016, the Maryland Lawyer's Rules of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified in Title 19 of the Maryland Rules with the term "attorney" substituted for the term "lawyer." *See* Maryland Rules 19-300.1 *et seq.* In an effort to enhance readability, we use abbreviated references to the prior codifications of these rules, which are consistent with the ABA Model Rules on which they are based (*i.e.,* Maryland Rule 19-301.1 will be referred to as Rule 1.1). *See* ABA Compendium of Professional Responsibility Rules and Standards (Am. Bar Ass'n 2017).

[2] Bar Counsel withdrew its allegation that Mr. Silbiger violated Rule 19-404 (Trust Account – Required Deposits). Thus, the hearing judge did not make conclusions on that allegation.

of Stipulated Facts that was submitted at the hearing. An Amended Joint Statement of Stipulated Facts ("Stipulation") was submitted on August 3, 2021.

The hearing judge issued a Memorandum of Findings of Fact and Conclusions of Law, on August 24, 2021, in which he found clear and convincing evidence that Mr. Silbiger violated MARPC 1.1, 1.4, 1.15, 8.1, 8.4(a)–(d), Rule 19-407, Rule 19-408, Rule 19-410, as well as BOP §10-306.[3] The hearing judge also made findings of fact related to aggravating and mitigating circumstances for this Court's consideration in formulating an appropriate sanction.

Neither the Commission nor Mr. Silbiger filed exceptions to any of the hearing judge's findings of fact or conclusions of law. This Court accepts a hearing judge's findings as established when no exceptions are filed. Md. Rule 19-740(b)(2)(a). We review the hearing judge's conclusions of law *de novo*. Md. Rule 19-740(b)(1). Furthermore, this Court determines whether clear and convincing evidence establishes that an attorney violated the MARPC. For the reasons set forth below, based on our independent review of the record, we affirm the hearing judge's legal conclusions on all matters.

**B. Facts**

*Mr. Silbiger's Law Practice*

Mr. Silbiger was admitted to the Bar of Maryland on September 21, 1970. At all times relevant to this proceeding, Mr. Silbiger was a solo practitioner who maintained an office for the practice of law in Westminster, Maryland.

---

[3] The hearing judge found that the Commission did not meet its burden of proof in establishing a violation of MARPC 1.3.

*Representation of Shannon Johnson*

On September 19, 2016, Shannon Johnson and her two minor children were injured in an automobile collision. The other driver was found to be at fault. Ms. Johnson retained Mr. Silbiger to represent her and her children in connection with their claims against the at-fault driver.

In November 2018, Mr. Silbiger settled Ms. Johnson's claims and those of her minor children for a total of $101,000. At the time of settlement, Ms. Johnson had obligations to pay $7,000 to Dan Tannen for "pre-settlement" funding,[4] as well as an outstanding Medicaid lien.

On November 21, 2018, Mr. Silbiger deposited the settlement check into his attorney trust account. That same day, he disbursed $1,200 from the settlement funds as a portion of his earned fee. On November 26, Mr. Silbiger made a second disbursement to himself for fees in the amount of $27,466.66. Several days later, on December 3, Mr. Silbiger issued a check in the amount of $7,000 payable to Mr. Tannen. On December 14, Mr. Silbiger made a partial disbursement of the settlement proceeds to Ms. Johnson in the amount of $16,385.97 but continued to hold back funds pending the resolution of her Medicaid lien.

Between December 19, 2018 and January 29, 2019, without Ms. Johnson's knowledge or permission, Mr. Silbiger knowingly and intentionally used $27,566.38 of her

---

[4] Ms. Johnson had an agreement with Mr. Tannen to reimburse him out of any settlement proceeds she received from her claim.

settlement proceeds to pay expenses associated with his law practice, including payroll for his employees, health insurance benefits, and monthly mortgage payments.

On January 21, 2019, after receiving confirmation that no additional funds were owed to Medicaid, Mr. Silbiger prepared a settlement sheet and wrote Ms. Johnson a check in the amount of $42,951.50 for the remainder of her settlement funds. However, because Mr. Silbiger did not have sufficient funds in his attorney trust account to cover the check, he did not deliver the check to Ms. Johnson until January 29, after he had deposited $35,000 of his personal funds into his attorney trust account. At that time, because Mr. Tannen had not cashed the $7,000 check, Mr. Silbiger's trust obligation remained $49,951.50.

On February 4, Ms. Johnson cashed the check for $42,951.50, leaving a balance of $6,714.88 in Mr. Silbiger's trust account—insufficient funds to cover the trust obligation to Mr. Tannen for his uncashed check in the amount of $7,000.

Between February 6 and February 12, Mr. Silbiger made two additional withdrawals from his trust account in checks made payable to himself. As a result, on February 15, 2019, when Mr. Tannen cashed the $7,000 check, it caused an overdraft in the amount of - $3,985.24 in Mr. Silbiger's trust account.

*Mr. Silbiger's Attorney Trust Account*

Mr. Silbiger maintained an attorney trust account at PNC Bank during the time relevant to this case. He admits that he made cash disbursements from his attorney trust account, commingled personal funds with client funds, paid personal expenses directly from his attorney trust account, and maintained negative client matter balances. Between

September 2018 and December 2020, Mr. Silbiger wrote 11 checks made payable to cash from his trust account, totaling $34,000. He made another cash withdrawal on November 15, 2019 in the amount of $36,666 for fees earned in another client matter. During the period between December 2018 through March 2019, Mr. Silbiger wrote four checks from his attorney trust account to three different banks for personal expenses totaling $7,391.06. As a result of Mr. Silbiger's actions, on several occasions between November 18, 2018 and July 29, 2019, the balance in his attorney trust account fell below the amount he was required to maintain in trust for his clients.

Based upon these transactions, the hearing judge found that Mr. Silbiger failed to safekeep his clients' funds in his attorney trust account. The hearing judge further determined that, although Mr. Silbiger's attorney trust account was out of balance on several occasions, all funds that were owed to all clients and third parties were received without delay.

*Bar Counsel's Investigation*

On February 22, 2019, Bar Counsel received notice from PNC Bank of the February 15, 2019 overdraft that occurred when Mr. Tannen presented the $7,000 check written to him on Mr. Silbiger's attorney trust account. That same day, Bar Counsel wrote to Mr. Silbiger, requesting that he explain the reason for the overdraft and provide copies of his client ledgers, deposit slips, cancelled checks, and monthly bank statements from December 2018 through February 2019. Mr. Silbiger responded on March 6, 2019 and explained that the overdraft occurred when funds that should have been deposited into his

6

escrow account were deposited into his regular account in error.[5] However, he failed to provide Bar Counsel copies of the documents that had been requested.[6]

On April 24, 2019, Bar Counsel's investigator, Charles E. Miller, IV, wrote Mr. Silbiger and again asked that Mr. Silbiger provide the documents requested by Bar Counsel in their February 22, 2019 letter. In early June 2019, Mr. Silbiger, through counsel, provided the documents Bar Counsel had requested, which included a client ledger for Thomas Riddle with a balance of $31,774.73 and a client ledger for Shannon Johnson with a balance of $5,991.87. Nevertheless, Mr. Silbiger's trust account reflected a negative balance of -$3,985.24 as of February 15, 2019. Accordingly, the records revealed that Mr. Silbiger failed to maintain accurate records for the receipt, maintenance, and disbursement of funds belonging to clients and third parties.

Bar Counsel wrote Mr. Silbiger on July 18, 2019 and requested additional information and records for the period of February 2019 through July 2019, including bank statements, copies of client ledgers, deposit slips, cancelled checks, and monthly bank statements. On September 6, 2019, Mr. Silbiger, through counsel, responded and admitted that without Ms. Johnson's knowledge or authorization, he

> borrowed $35,000 from the Shannon Johnson settlement . . . . In this context, the term "borrowed" means that [he] borrowed funds for his own purposes

---

[5] Mr. Silbiger testified that he became aware of this error on a Friday evening and went to the bank Saturday morning and again, on Monday morning to redeposit a $9,000 fee check into his trust account to satisfy the $7,000 check.

[6] Mr. Silbiger testified that he provided the information that he thought would satisfy Bar Counsel's concern about the negative balance and incorrect deposit related to his attorney trust account. He further testified that he was concerned that providing additional documentation would reveal other items that would be detrimental to him.

with the intention of repaying the funds within a short period of time, which he did. The term "borrowed" is not meant to imply that [he] had an agreement with Shannon Johnson with regard to the use of these funds. . . . The funds from the settlement of Shannon Johnson's claim that [he] borrowed and repaid were not funds that could have been disbursed to Shannon Johnson at the time the funds were borrowed, as these funds were subject to a claim by a lienholder that was then under negotiation. When the lien was compromised, [he] repaid the funds in full to his trust account, and made prompt and full disbursement of all funds due to his client. [He] always intended to repay the borrowed funds. Shannon Johnson was not harmed. When [he] repaid the loan, he initially, and mistakenly, deposited part of the repayment into the wrong account, which was the direct cause of the negative balance on February 15, 2019.

*Evidence and Testimony from the Evidentiary Hearing*

As stated above, an evidentiary hearing was held on July 7, 2021. The evidence consisted of ten exhibits, including the PNC Bank records pertaining to Mr. Silbiger's trust account, a summary of the bank records, the Stipulation (in which Mr. Silbiger admitted to the conduct that was the subject of the hearing), and letters exchanged between Mr. Silbiger's counsel and Bar Counsel. Mr. Silbiger testified and called three character witnesses, each of whom had known Mr. Silbiger both personally and professionally for approximately 25–30 years.

Mr. Silbiger testified that he had a thriving law practice until 2018 when he spent a considerable amount of money on marketing and advertising in an effort to compete with larger law firms. Unfortunately, this investment did not pay off, and his practice began to decline. When Mr. Silbiger's cash flow diminished, and he was faced with office expenses, payroll, mortgages, and other expenses, he became distressed. He testified that he made the ill-fated decision to borrow funds from his attorney trust account—to "rob Peter to pay Paul"—because "I was so anguished over the fact that I couldn't satisfy my expenses." He

8

made this decision despite his testimony that he held a 50% ownership in a marina[7] that was doing exceedingly well.  In fact, he testified that the marina's operating account had "an abundance of cash" that was accessible to him "at any time," and he "always knew that if it came to the point where I had to satisfy the money I took from the trust account, I would always have the wherewithal to pay it back through the marina . . . ."  However, his "pride got in the way[,]" and he was too "embarrassed" to ask his partner in the marina if he could take funds from the marina account to meet the commitments and expenses of his law practice.  Being too proud to go to his partner, Mr. Silbiger decided to use funds from his attorney trust account to cover his expenses.  Mr. Silbiger asserts that it was never his intent to permanently deprive anyone of their funds and that he always had the ability to repay the borrowed funds.  And in fact, he did pay all of it back.

Mr. Silbiger also testified concerning the presence of several mitigating factors that we will discuss more fully herein.  In addition to his own testimony, Mr. Silbiger presented three witnesses who testified about his character and reputation.  Lance Montour, Esquire testified that he worked for Mr. Silbiger from 1996 through 1999, and since then, they have remained "social friends" and "professional colleagues."  Mr. Montour testified that Mr. Silbiger has a big heart, would reduce his fees when clients could not pay, and treats clients and other attorneys with respect and professionalism.  According to Mr. Montour, Mr. Silbiger is trustworthy, honest, a person of integrity, and well-respected in the legal community.  Mr. Montour stated that, in his 25 years of professional interactions with Mr.

---

[7] Mr. Silbiger testified that the marina sold in October 2019 for $7.5 million dollars.

9

Silbiger, he was unaware of any other violations of the professional rules of conduct and was certain that Mr. Silbiger's misconduct here was an isolated incident.

William Finch, Jr., Esquire testified that he has known Mr. Silbiger since the early 1980s. They became acquainted through the Carroll County Bar Association and over the years, have often discussed professional issues relating to cases such as witnesses, experts, and tactical issues. Mr. Finch described Mr. Silbiger as always being "very well prepared" and "very professional, very smooth, and very warm and friendly." He also testified that he had never observed Mr. Silbiger to be "anything other than trustworthy or a person of integrity[]" and that Mr. Silbiger "enjoys an excellent reputation" in the legal community. Mr. Finch stated that he was surprised to hear about the misconduct charges, which Mr. Silbiger had voluntarily shared with him, which had caused Mr. Silbiger a great deal of anguish. Mr. Finch stated that Mr. Silbiger had made no effort to try to "justify or mitigate" his wrongdoing. Mr. Finch noted that because Mr. Silbiger has "had a long and honorable career[,]" he hoped that Mr. Silbiger would be given a "second chance," a chance at "professional redemption."

Judge Joseph Barry Hughes testified that he had known Mr. Silbiger since the early 1980s, prior to Judge Hughes being appointed to the bench. Judge Hughes, initially in his capacity as a colleague and, later, as a judge, described him as being "very professional," "friendly," and "extremely competent." After becoming a judge, his impression of Mr. Silbiger's preparation and interactions with clients and opposing counsel was that Mr. Silbiger was "[s]uperior" and "in the upper tier of really all of the attorneys that I have dealt with over the years, both on the bench and before that[.]" Judge Hughes described Mr. Silbiger's reputation among the Carroll County Bar as being "trustworthy" and noted

10

that he "has an excellent reputation in Carroll County . . . ." Judge Hughes testified that he "wouldn't do this for just anybody[,]" and that

> it is absolutely essential for both the fact finder and for the Court of Appeals to know the full counter weight against the conduct that [Respondent] has been charged with so that the scales can be true, and that both Judge Becker and the Court of Appeals can make an informed and accurate, and hopefully compassionate, decision.

## II

## Violations of the Rules of Professional Conduct

Based on the record and the above-summarized findings of fact, the hearing judge concluded, by clear and convincing evidence, that Mr. Silbiger violated MARPC 1.1, 1.4, 1.15, 8.1, 8.4(a)–(d), Md. Rule 19-407, Md. Rule 19-408, Md. Rule 19-410, as well as BOP §10-306. Neither Mr. Silbiger nor the Commission filed exceptions. Based upon our independent review of the record, we agree with the hearing judge's conclusions that Bar Counsel established a violation of these rules by clear and convincing evidence.

### *Competence—Failing to Meet Basic Standards (1.1)*

"An attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 1.1. The hearing judge concluded that Mr. Silbiger failed to satisfy the standards of competence when he: (1) failed to safekeep client and third-party funds; (2) failed to keep the required deposits and balances in his trust account; (3) failed to keep accurate and realistic records of his trust account; (4) improperly commingled his funds with those of his trust fund; and (5) performed prohibited transactions. *Attorney Grievance Comm'n v. Smith*, 443 Md. 351, 369 (2015) (citing

11

*Attorney Grievance Comm'n v. Mungin*, 439 Md. 290, 305 (2014) ("an attorney demonstrates his or her incompetence by failing to properly maintain settlement monies in a trust account resulting in negative balances")); *Attorney Grievance Comm'n v. Blatt*, 463 Md. 679, 699 (2019) ("The failure to maintain funds received on behalf of a client in a trust account demonstrates incompetence.") (citation omitted).

We agree with the hearing judge that the record supports clear and convincing evidence that Mr. Silbiger violated Rule 1.1, and that the violations, taken separately or together, constitute a "lack of competence and proficiency in the practice of law, regardless of any intent not to permanently deprive clients of their funds."

*Failure to Communicate (1.4)*

Rule 1.4 provides that:

(a)  An attorney shall:

    (1)   promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0(f)(1.0), is required by these Rules;

    (2)   keep the client reasonably informed about the status of the matter;

    (3)   promptly comply with reasonable requests for information; and

    (4)   consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.

(b)   An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The hearing judge concluded that Mr. Silbiger violated Rule 1.4 when—without Ms. Johnson's knowledge or authorization—he made disbursements from her settlement funds. These disbursements constituted an intentional misappropriation. Furthermore, Mr. Silbiger failed to inform Ms. Johnson of his misappropriation of her funds. We agree with the hearing judge's conclusion that Mr. Silbiger violated Rule 1.4.

*Failure to Safekeep Property (1.15)*

Rule 1.15(a) provides, in relevant part:

**(a)** An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

**(b)** An attorney may deposit the attorney's own funds in a client trust account only as permitted by Rule 19-408 (b).

\* \* \*

**(d)** Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

This Court has held that "withdrawing funds from a trust account for personal matters also constitutes a violation of Rule 1.15(a)." *Attorney Grievance Comm'n v. Bell*, 432 Md. 542, 553 (2013). Furthermore, "[t]he mere fact that the balance in an attorney

13

trust account falls below the total amounts held in trust supports a *prima facie* finding of [a] violation of [Rule 1.15.]" *Id.* at 552–53 (alteration in original) (quoting *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 472 (1996)).  Moreover, "funds shall be kept in a separate account . . . records shall be created and maintained . . . and [c]omplete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years . . . ." Rule 1.15(a).  In *Attorney Grievance Comm'n v. Gelb*, 440 Md. 312, 325 (2014) this Court held that the attorney's "lack of proper record-keeping, combined with his mishandling of the funds in his attorney trust account . . . [rose] to a level of incompetent representation in violation of [MARPC 1.1]."

The hearing judge found, and Mr. Silbiger admitted, that Mr. Silbiger made cash disbursements and paid personal expenses from his attorney trust account.  In conjunction with these actions, he wrote checks from his attorney trust account to Sandy Spring Bank, First National Bank, and Bank of Glen Burnie.  These disbursements were the cause of the negative balance in his attorney trust account.  Additionally, Mr. Silbiger commingled his personal funds with client funds and failed to create and maintain records in accordance with Maryland Rule 19-407.

Mr. Silbiger asserts that he "always intended to repay the 'borrowed' funds[,]" and that Ms. Johnson "was not harmed." This Court has expressed concerns regarding potential injuries to which a violation of Rule 1.15 could lead.[8]  "We cannot understate the

---

[8] During oral argument, Judge Biran posited the question:

"What if he had been hit by a bus in the interim? . . . [H]e thought he could repay with ease, but shouldn't we be concerned about other

importance of holding funds in escrow in accordance with Rule 1.15 and how the Rule reinforces the public's confidence in our legal system. Escrow accounts serve as sanctuary for client funds from the attorney's creditors." *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 31 (1999).

We agree with the hearing judge that Mr. Silbiger violated Rule 1.15 when he made cash disbursements from his trust account, commingled personal funds with client funds, paid personal expenses directly from his attorney trust account, and maintained negative client matter balances.

*Failure to Respond to Bar Counsel's Request for Information (8.1)*

It goes without saying that cooperation with Bar Counsel's investigation is imperative. Rule 8.1(b) provides, in part, that an attorney shall not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority[.]"

While the information Mr. Silbiger provided to Bar Counsel regarding the error made in depositing funds into the wrong account was true, he acknowledged that he knew that full disclosure of the information requested would expose the extent of his misappropriation. The hearing judge observed that Mr. Silbiger fully responded to Bar

---

cases where people might subjectively believe, of course, I'll be able to repay, and I want to repay, and then something happens, and they don't?"

15

Counsel's second request in a timely manner and "never gave an excuse or prevaricated as to the overall delay."

We agree with the hearing judge that Mr. Silbiger violated Rule 8.1 when, in his initial response to Bar Counsel's February 22, 2019 letter, he knowingly and intentionally held back information and documentation that he knew would reveal his misconduct.

*General Misconduct (8.4)*

Rule 8.4(a) provides that an attorney commits professional misconduct if the attorney "violate[s] or attempt[s] to violate the [MARPC], knowingly assist[s] or induce[s] another to do so, or do so through the acts of another." As a result of Mr. Silbiger committing other disciplinary rules, the hearing judge found, and we agree, that he violated Rule 8.4(a).

Under Rule 8.4(b), it is professional misconduct for an attorney to "commit a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as an attorney in other respects[.]" The hearing judge found that Mr. Silbiger violated Rule 8.4(b) when he misappropriated client funds and used the funds to pay for personal and business expenses. The hearing judge further observed that while "no criminal prosecution has been initiated in this matter, sufficient evidence was presented at the hearing to sustain a finding that the underlying wrongful conduct occurred." In *Attorney Grievance Comm'n v. Garland*, 345 Md. 383, 395 (1997), this Court stated that "[an] attorney may be disciplined for acts which are criminal but do not result in a criminal conviction if Bar Counsel proves the underlying conduct at the disciplinary hearing." Thus, as discussed *infra*, the hearing judge found that with the misappropriation of funds, Mr. Silbiger also

16

violated § 10-306 of the Business Occupations and Professions Article. "A Rule 8.4(b) violation occurs when an attorney willfully violates Section 10-306 of the Business Occupations and Professions Article, which constitutes a criminal misdemeanor." *Attorney Grievance Comm'n v. Karambelas*, 473 Md. 134, 167 (2021) (citations omitted). We agree that Mr. Silbiger violated Rule 8.4(b).

Rule 8.4(c) provides that an attorney who engages in "conduct involving dishonesty, fraud, deceit or misrepresentation" commits professional misconduct. The hearing judge concluded that Mr. Silbiger violated Rule 8.4(c) by engaging in dishonest conduct, and we agree. The hearing judge stated that there was clear and convincing evidence that Mr. Silbiger "exhibited a lack of straightforwardness, probity, and integrity in his conduct[,]" and that the misappropriation of client funds was "dishonest and misrepresentative behavior." *See Smith*, 443 Md. at 376 (citing *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 555 (2014) ("Attorneys violate [MARPC] 8.4(c) when they . . . conceal material information from their clients, even if they have not misrepresented explicitly the information.")). We agree that, by his omissions, Mr. Silbiger concealed from Ms. Johnson that he had misappropriated her settlement funds. At oral argument, when asked by the Court if Ms. Johnson "ever found out what he did," Mr. Silbiger's counsel indicated that Ms. Johnson likely does not know that Mr. Silbiger "borrowed" her funds, nor did she apparently suffer any harm because Mr. Silbiger replaced the funds, making his trust account whole. The fact that Ms. Johnson may still not be aware of Mr. Silbiger's misconduct does not excuse it—to the contrary, the continued omission is troubling.

17

The hearing judge concluded that Mr. Silbiger violated Rule 8.4(d) as contended by the Commission. Under Rule 8.4(d), an attorney commits professional misconduct when he "engage[s] in conduct that is prejudicial to the administration of justice[.]" Mr. Silbiger failed to safekeep and maintain client funds in his attorney trust account, commingled funds, and paid for personal and business expenses from his trust account. "We have long recognized that the failure to maintain settlement funds intact until disbursed—the commingling of personal and client funds—constitutes a violation of [MARPC] 8.4(d)." *Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 297 (2005). Despite Mr. Silbiger's intent to replenish the funds in a timely manner, the hearing judge found that he violated the law and ethical rules, and that his "conduct certainly would negatively impact a member of the public's perception of and trust in the legal profession and the legal system, and, therefore, it was prejudicial to the administration of justice." In *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 713 (2002), we stated that "[i]f this Court were not to sanction respondent severely, other lawyers would not receive appropriate guidance regarding the standards to which all should be held and public confidence in the legal profession might be greatly diminished." We agree with the hearing judge's conclusion that Mr. Silbiger violated Rule 8.4(d) by engaging in conduct that is prejudicial to the administration of justice.

*Attorney Trust Account Record-Keeping (Md. Rule 19-407)*

Rule 19-407 sets forth the requirements by which all attorneys must abide in connection with trust-account record keeping, including the creation and maintenance of detailed records of all deposits and disbursements of client funds and funds held on behalf

18

of third persons, records required for each client matter in which the attorney receives funds in trust, a monthly reconciliation of attorney trust account records, client matter records, funds of the attorney held in the trust account, and record retention requirements.[9]

The hearing judge concluded, and we agree, that Mr. Silbiger violated Rule 19-407 by his failure to create and maintain accurate records related to his attorney trust account.

---

[9] Rule 19-407 provides as follows:

**(a) Creation of Records.** The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

(1) *Attorney Trust Account Identification.* An identification of all attorney trust accounts maintained, including the name of the financial institution, account number, account name, date the account was opened, date the account was closed, and an agreement with the financial institution establishing each account and its interest-bearing nature.

(2) *Deposits and Disbursements.* A record for each account that chronologically shows all deposits and disbursements, as follows:

(A) for each deposit, a record made at or near the time of the deposit that shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client or third person for whom the funds were deposited, and (iv) the purpose of the deposit;

(B) for each disbursement, including a disbursement made by electronic transfer, a record made at or near the time of disbursement that shows (i) the date of the disbursement, (ii) the amount, (iii) the payee, (iv) the identity of the client or third person for whom the disbursement was made (if not the payee), and (v) the purpose of the disbursement;

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction.

(3) *Client Matter Records.* A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

19

Although his client ledgers for Thomas Riddle and Shannon Johnson showed positive balances, as of February 15, 2019, his trust account had a negative balance of -$3,985.24. He also failed to maintain an accurate record for each account that showed all deposits and reimbursements, specifically, the 11 checks, totaling $34,000—made payable to cash—or the $35,000 deposit he made to his attorney trust account from his personal funds. On several occasions, Mr. Silbiger's trust account balance fell below the amount he was required to maintain. The hearing judge noted that while "the bank statements accurately reflected the transactions, bank statements are not client records in and of themselves" and

---

   (B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.
   (4) *Record of Funds of the Attorney.* A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 19-408 (b).

**(b) Monthly Reconciliation.** An attorney shall cause to be created a monthly reconciliation of all attorney trust account records, client matter records, records of funds of the attorney held in an attorney trust account as permitted by Rule 19-408 (b), and the adjusted month-end financial institution statement balance. The adjusted month-end financial institution statement balance is computed by adding subsequent deposits to and subtracting subsequent disbursements from the financial institution's month-end statement balance.

**(c) Electronic Records.** Whenever the records required by this Rule are created or maintained using electronic means, there must be an ability to print a paper copy of the records upon a reasonable request to do so.

**(d) Records to be Maintained.** Financial institution month-end statements, any canceled checks or copies of canceled checks provided with a financial institution month-end statement, duplicate deposit slips or deposit receipts generated by the financial institution, and records created in accordance with section (a) of this Rule shall be maintained for a period of at least five years after the date the record was created.

therefore, they did not meet the requirements of the rule. Additionally, Mr. Silbiger's "personal recordkeeping was not in compliance."[10] Although the hearing judge credited Mr. Silbiger's testimony that he tracked the amount he needed to pay back and never intended to permanently deprive anyone of their funds, the hearing judge concluded, and we agree, that Mr. Silbiger's intention to repay the client funds does not negate the violation of Rule 19-407.

*Commingling of Funds (19-408)*

Rule 19-408(a) provides that an "attorney . . . may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 19-404 or permitted to be so deposited by section (b) of this Rule." Mr. Silbiger admitted to having used his own funds to replace misappropriated funds from his trust account. The hearing judge concluded that Mr. Silbiger violated Rule 19-408 by commingling his personal funds with client funds to replace misappropriated fund from his attorney trust account. We agree.

*Prohibited Transactions (19-410)*

Rule 19-410 provides:

> **(a)     Generally.** An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.

---

[10] Mr. Silbiger testified that "[I] never had an intention to [permanently deprive anyone of their property.] In fact, I kept a yellow sheet that I carried with me all the time as to how much I had to pay back. And that kept me—that part kept me awake at night. And that sheet was always with me, knowing what I had to pay back. And I eventually did pay all of it back."

**(b)** **No Cash Disbursements.** An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.

**(c)** **Negative Balance Prohibited.** No funds from an attorney trust account shall be disbursed if the disbursement would create a negative balance with regard to an individual client matter or all client matters in the aggregate.

Mr. Silbiger admitted to misappropriating Ms. Johnson's funds without her knowledge or authorization; using the funds for unauthorized purposes; writing 11 checks—made payable to cash—which totaled $34,000; making a cash withdrawal in the amount of $36,666 from his attorney trust account; and on several occasions, allowing his trust account balance to fall below the amount he was required to maintain for his clients. Thus, the hearing judge concluded, and we agree that Mr. Silbiger violated Rule 19-410.

*Maryland Code, Business Occupations & Professions, § 10-306*

Section 10-306 of the Md. Code, Business Occupations & Professions Article ("BOP") provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." "One who willfully violates Section 10-306 is guilty of a misdemeanor . . . [a]s such, a willful violation of Section 10-306 necessarily violates Rule 8.4(b) (prohibiting the commission of a criminal act that reflects adversely on the lawyer's trustworthiness)." *Karambelas*, 473 Md. at 170 (citations omitted). We agree with the hearing judge's conclusion that Mr. Silbiger violated BOP §10-306 when he used money from his trust account, and knowingly and intentionally misappropriated settlement funds belonging to Ms. Johnson and Mr.

22

Tannen, for purposes other than that which they were entrusted to him and did so without Ms. Johnson's knowledge or consent.

## III

### Sanction

Bar Counsel recommends that Mr. Silbiger be disbarred from the practice of law. In support of this recommendation, Bar Counsel cites to Mr. Silbiger's multiple violations of the MARPC and this Court's well-established case law, which sets forth that when an attorney engages in knowing and intentional conduct that involves the misappropriation of funds, disbarment is warranted. Mr. Silbiger, however, asserts that this case "has always been about mitigation and the appropriate sanction." Although Mr. Silbiger acknowledges the serious nature of his misconduct, he argues that disbarment is not warranted in his case, because he contends that the substantial number of mitigating factors outweigh the aggravating factors. During oral argument, counsel for Mr. Silbiger requested that this Court impose a sanction of less than disbarment and indicated that the more appropriate sanction was a definite six-month suspension.

As we have repeated numerous times, when this Court determines a sanction in an attorney discipline case, we do so with the primary purpose of protecting the public and deterring future misconduct rather than to punish the attorney. In evaluating each attorney grievance matter to determine the sanction to be imposed, "we typically consult the list of aggravating and mitigating factors developed by the American Bar Association." *Attorney Grievance Comm'n v. Ibebuchi*, 471 Md. 286, 309 (2020). Neither party filed any exceptions

to the hearing judge's findings with respect to the aggravating and mitigating factors established by the evidence.

### A. Aggravating Factors[11]

The hearing judge found clear and convincing evidence of four aggravating factors: (1) dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple violations of the MARPC; and (4) substantial experience in the practice of law. We agree with the hearing judge that these aggravating factors were established. Mr. Silbiger demonstrated a dishonest or selfish motive when he intentionally misappropriated client funds and used them to pay personal and business expenses. Mr. Silbiger acknowledged that he had access to funds through his ownership in the marina[12] but was too proud to admit to his business partner in the marina venture that he was having financial

---

[11] We have recognized the following aggravating factors when considering the imposition of sanctions:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the [MARPC]; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court or the hearing judge; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Sperling*, 459 Md. 194, 275 (2018) (citation omitted).

[12] Mr. Silbiger testified that he had a fifty-percent ownership interest in the marina and that there was "an abundance of cash in the account."

24

difficulties at his law firm. Rather than admit his financial difficulties to his marina business partner, Mr. Silbiger misappropriated Ms. Johnson's funds from his attorney trust account. Additionally, we agree that Mr. Silbiger displayed a pattern of misconduct related to his attorney trust account and safekeeping of funds. He misappropriated client funds, made several prohibited cash disbursements from his attorney trust account, commingled funds with client funds, paid personal expenses directly from his attorney trust account, and maintained negative client balances. These actions resulted in multiple rule violations. We also agree with the hearing judge's conclusion that Mr. Silbiger had substantial experience in the practice of law.

## B.    *Mitigating Factors*[13]

With respect to mitigating factors, the hearing judge found that Mr. Silbiger established the presence of the following mitigating factors by a preponderance of the

_____

[13] This Court has recognized the following mitigating factors when considering the imposition of sanctions:

> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability, (b) the chemical dependency or mental disability caused the misconduct, (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation, and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse;

evidence: (1) the absence of a prior disciplinary record; (2) timely good faith efforts to rectify the consequences of his misconduct; (3) a good reputation in the legal community; (4) genuine remorse for his conduct; (5) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding[14]; and (6) unlikelihood of repetition of the misconduct.[15]

The hearing judge commented on the compelling testimony of Mr. Silbiger's character witnesses, who testified to his "unblemished record and reputation as an otherwise competent, careful attorney who is always attentive to and respectful of others and with an excellent reputation as an ethical practitioner with this subject episode being the only black mark against him in over 50 years of practice." The hearing judge also observed that Mr. Silbiger "consistently and candidly took full and knowing responsibility for his actions," and "was very forthright from the outset . . . never affirmatively denying these violations, but acknowledging his guilty conduct, shame, and embarrassment."

---

(13) remoteness of prior violations of the [MARPC]; and (14) unlikelihood of repetition of the misconduct.

*Sperling*, 459 Md. at 277–78 (citation omitted).

[14] The hearing judge noted that Mr. Silbiger adequately made a full and free disclosure to Bar Counsel's request for documents, albeit delayed, when he made a partial response to the first inquiry regarding the deposit made to the wrong account, and then, following the second request made full disclosure without providing excuses or "prevarication" for the delay. The hearing judge further stated that Mr. Silbiger "demonstrated overall, at least, an adequately cooperative attitude toward [Bar Counsel] and the attorney discipline process."

[15] The hearing judge found Mr. Silbiger's testimony concerning his remorse to be "very worthy of belief and acceptance[,]" and commented on the "shame and embarrassment [Mr. Silbiger] experienced[.]"

26

In addition to paying back the funds that he misappropriated from his trust account, the hearing judge found credible Mr. Silbiger's testimony that he did not intend to permanently deprive the client and third party of the funds. The hearing judge stated that Mr. Silbiger's intent to repay the funds is "bolstered by the fact that on January 29, 2019, [Mr. Silbiger] deposited $35,000 of his own funds into this attorney trust account," despite recognizing that repaying the client funds from his personal funds was another violation of the professional rules.

In his consideration of the mitigating factors, the hearing judge observed that Mr. Silbiger

> [a]cknowledged that he had relatively easy access to funds from an investment with a partner in a marina in Anne Arundel County, which eventually sold for $7.5 million shortly after these misappropriations, which he could have used to meet the then unpaid expenses of his law practice, but instead was too proud and embarrassed to ask for that money from his investment partner. [Mr. Silbiger] further indicated that his knowing misappropriation was only temporary, that he kept track of the wrongful disbursements on a yellow legal pad, and that it was always his intent to replenish these trust monies timely so that neither the client nor any of the related lienholders suffered any delays or losses in receiving the funds, which in fact did occur before the Petitioner's involvement herein.

### C. Imposition of Sanction

As we consider the aggravating and mitigating circumstances in connection with the imposition of a sanction, we begin with the notion that in cases involving intentional dishonesty, disbarment is ordinarily warranted. *Attorney Grievance Comm'n v. Bonner*, 477 Md. 576, 621 (2022) (collecting cases). In two recent cases, we conducted a survey of the sanctions that this Court has imposed in the two decades since this Court decided *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376 (2001)—the seminal case that

27

established the standard for determining the sanction in cases involving dishonest conduct.[16]  *See Attorney Grievance Comm'n v. Collins*, 477 Md. 482 (2022) and *Bonner*, 477 Md. 576.

In *Collins*, we examined our sanctions jurisprudence involving intentional dishonesty since *Vanderlinde*, noting multiple instances in which we imposed a sanction less than disbarment, despite the absence of compelling extenuating circumstances that were determined to be the "root cause" of the misconduct at issue, which would thereby justify the imposition of a lesser sanction.  *Collins*, 477 Md. at 518–30.[17]  Based upon our survey of cases, we observed that

---

[16] In *Attorney Grievance Commission v. Vanderlinde*, 364 Md. 376, 413–14 (2001), we stated that:

> in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the [MARPC].  Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

(Emphasis in original).

[17] Cases involving intentional dishonesty in which a sanction less than disbarment was imposed (and where the *Vanderlinde* "compelling extenuating circumstances" were not established) include *Attorney Grievance Comm'n v. Johnson*, 472 Md. 491 (2021) (imposing a sentence of indefinite suspension, with the right to reapply after one year, where an attorney's nephew, a non-attorney employee, misappropriated client's funds from the attorney trust account, and after discovering the employee's theft, the attorney acted in a deceitful manner by "lying to his clients to prolong the time in which he had to remit their

[w]hat can be gleaned from the sanctions imposed in cases involving intentional dishonesty post-*Vanderlinde* in recent years, is that, increasingly, we have not imposed the sanction of disbarment where the dishonest conduct at issue does not involve theft, fraud, harm to a client or third party, or the intentional misappropriation of funds. We have on multiple occasions imposed a sanction less than disbarment in cases involving intentional

settlement funds[ ]"); *Attorney Grievance Comm'n v. Riely*, 471 Md. 458 (2020) (imposing a sanction of indefinite suspension, with the right to apply for reinstatement no sooner than one year, where the attorney made a false statement to a government agency at a meeting during the course of representing a client, misled a client about the efforts made on her behalf in a case, and made false statements to Bar Counsel in a letter about the case); *Attorney Grievance Comm'n v. Keating*, 471 Md. 614 (2020) (imposing a sanction of indefinite suspension, with the right to apply for reinstatement in six months, where the attorney submitted a will to the Register of Wills which she falsely represented that she had witnessed (when in fact she signed the will after her client's death, in an effort to carry out her client's wishes)); *Attorney Grievance Comm'n v. Singh*, 464 Md. 645 (2019) (imposing a sanction of sixty days' suspension where the attorney falsely testified at a deposition during Bar Counsel's investigation that his practice was to deposit a client's filing fees into a trust account instead of his operating account, where the fees remained until he paid the filing fee); *Attorney Grievance Comm'n v. Hecht*, 459 Md. 133 (2018) (imposing a sanction of indefinite suspension, with the right to petition for reinstatement after twelve months where the attorney undertook representation of a client during a period when he was suspended, made misrepresentations to his client about his suspension, and made misrepresentations to Bar Counsel during the investigation); *Attorney Grievance Comm'n v. Steinhorn*, 462 Md. 184 (2018) (imposing a sanction of indefinite suspension with the right to apply for reinstatement after six months where the attorney knowingly included false information in complaint forms filed in a trial court by lumping together an amount of an underlying debt and attorney's fees and representing the total as the underlying debt in an effort to conceal that he was collecting attorney's fees); *Attorney Grievance Comm'n v. Sperling & Sperling*, 459 Md. 194 (2018) (imposing a sanction of ninety days' suspension where attorney failed to safeguard funds in an attorney trust account and failed to supervise his brother—a suspended attorney whose sanction of indefinite suspension was continued as a result of this case—who remained a signatory on the attorney trust account and continued to write checks on the account); *Attorney Grievance Comm'n v. Shapiro*, 441 Md. 367 (2015) (imposing a sanction of indefinite suspension where the attorney concealed from a client the status of a malpractice case for five years and made direct misrepresentations to the client leading her to believe that the case was active); *Attorney Grievance Comm'n v. Brigerman*, 441 Md. 23 (2014) (imposing a sanction of indefinite suspension where the attorney misrepresented to his client and Bar Counsel that he would promptly return the client's file to the client); *Attorney Grievance Comm'n v. Sperling*, 432 Md. 471 (2013) (imposing a sanction of indefinite suspension where the attorney made material misrepresentations to the trial court in his representation of clients in an attempt to mislead the court into reopening his client's case).

dishonest conduct where there was no theft or intentional misappropriation of funds by the attorney, the attorney had not benefitted or profited from the misconduct, and no client had been harmed. Going forward, it is clear that cases involving dishonesty and knowingly made false statements will be assessed on an individual basis to determine whether the misconduct at issue gives rise to deployment of the standard set forth in *Vanderlinde*, namely, whether compelling extenuating circumstances that are the "root cause" of the misconduct are required to warrant a sanction less than disbarment.

*Collins*, 477 Md. at 530.

In *Bonner*, we made an additional observation concerning cases in which "disbarment" was the appropriate sanction, as opposed to the "non-disbarment" cases involving intentional dishonesty. 477 Md. at 622. Specifically, we pointed out that, "although these 'non-disbarment' cases involve intentional dishonest conduct, they have a common nexus—specifically, there was no theft or intentional misappropriation of funds by the attorney, and the attorney did not benefit or profit from the misconduct." *Id*. Indeed, in the more than 20 years since our decision in *Vanderlinde*, there do not appear to be any cases in which this Court, in the exercise of its original jurisdiction,[18] imposed a sanction less than disbarment where the intentional dishonesty involved misappropriation of funds or theft. *See, e.g.*, *Bonner*, 477 Md. at 627 (disbarment was the appropriate sanction where the attorney misappropriated funds, engaged in elaborate lies to his partners, and created false calendar and false time entries to hide his actions); *Vanderlinde*, 364 Md. 376,

---

[18] In *Attorney Grievance Comm'n v. Bonner*, 477 Md. 576, 623 n.19 (2022), we distinguished two cases which involved the imposition of reciprocal discipline involving intentional dishonesty where we imposed a sanction less than disbarment. *See Attorney Grievance Comm'n v. Burghardt*, 442 Md. 151 (2015) and *Attorney Grievance Comm'n v. Stillwell*, 434 Md. 248 (2013). Neither of these cases involved misappropriation from an attorney trust account.

30

(underlying misconduct involved theft of funds from an employer); *Attorney Grievance Comm'n v. Levin*, 438 Md. 211 (2014) (disbarring attorney who misrepresented his caseload and anticipated fees to his employer by creating fictitious clients and paperwork in order to obtain additional salary); *Attorney Grievance Comm'n v. Vanderslice*, 435 Md. 295 (2013) (rejecting the imposition of reciprocal discipline of a one-year suspension in favor of disbarment where the attorney intentionally committed theft eight times over a period of ten months); *Attorney Grievance Comm'n v. Carithers*, 421 Md. 28 (2011) (disbarring attorney for conduct including misappropriation of attorney's fees owed to his law firm); *Attorney Grievance Comm'n v. Weiss*, 389 Md. 531 (2005) (declining to impose reciprocal discipline of suspension, in favor of disbarment, where attorney misappropriated funds from his law firm in the District of Columbia); *Attorney Grievance Comm'n v. Vlahos*, 369 Md. 183 (2002) (disbarment was the appropriate sanction where attorney misappropriated funds belonging to his law firm over a period of approximately one and one-half years); *Attorney Grievance Comm'n v. Spery*, 371 Md. 560 (2002) (disbarment was the appropriate sanction where an attorney misappropriated $47,821.16 from his real estate partnership over a period of five years and made misrepresentations to his partners to conceal the theft).

To support his argument that we should impose a sanction less than disbarment here, Mr. Silbiger points out that in *Collins*, we acknowledged that disbarment is not always warranted even where the *Vanderlinde* standard is not satisfied. *Collins*, 477 Md. at 530. Moreover, he notes that we reiterated that we do not apply a "bright-line rule and will look at the individual facts and circumstances of the particular case[]" in determining the

31

appropriate sanction.  *Bonner*, 477 Md. at 621.  To justify a lesser sanction here, Mr. Silbiger points to the considerable mitigating circumstances that were established.

Mr. Silbiger is correct that we will not always impose a sanction of disbarment for intentional dishonesty in the absence of the *Vanderlinde* standard.  He is also correct that this Court has stated that intentional misconduct does not result in the imposition of a bright-line rule in which we always impose a sanction of disbarment.  In other words, when imposing a sanction, we consider the individual facts and circumstances of each particular case—including the nature of the specific ethical rule or rules that have been violated, as well as the aggravating and mitigating factors established.  That said, as we noted above, in the decades since our pronouncement of the *Vanderlinde* standard, we have not imposed a sanction less than disbarment where the underlying conduct involves theft or misappropriation of funds, and we decline to do so here.  Our unwillingness to impose a sanction less than disbarment here is not based upon the application of a bright-line rule, and we have carefully considered the presence of the aggravating and mitigating circumstances established.  Some of the most difficult attorney discipline cases for this Court are those in which the attorney, like Mr. Silbiger, has had a long and distinguished career.  We have considered the credible testimony of the character witnesses who, to quote the hearing judge, all attested to Mr. Silbiger's "unblemished record and reputation as an otherwise competent, careful attorney who is always attentive to and respectful of others and with an excellent reputation as an ethical practitioner with this subject episode being the only black mark against him in over 50 years of practice."  We have considered Mr. Silbiger's reputation, the genuine remorse found by the hearing judge, the candor and

responsibility that he has taken, and the fact that no clients were harmed by his actions—which in essence, amount to taking a short term, interest-free loan from the client without her knowledge or consent. However, we cannot ignore that Mr. Silbiger violated one of the most sacred obligations of an attorney. "It has been our long-held and consistent position that the entrustment to attorneys of the money and property of others involves a responsibility of the highest order" and that "appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated." *Attorney Grievance Comm'n v. Jones*, 428 Md. 457, 469 (2012) (cleaned up). Our imposition of a particular sanction demonstrates to members of the legal profession the type of conduct that will not be tolerated. *Gallagher*, 371 Md. at 714 (citations omitted). It also ensures that the public has confidence in the legal profession. *Jones*, 428 Md. at 468. Under the circumstances presented in this case, Mr. Silbiger knew that his conduct was wrong, and admits that he had other funds at his disposal that could have covered the expenses of his law firm. Instead of tapping into those funds (which would have caused him personal embarrassment with his partner in his marina venture), he took funds from his trust account to cover expenses without his client's knowledge and consent. We cannot minimize or excuse the misconduct simply because his client was not harmed and may have never even known that it occurred. To impose a sanction less than disbarment simply on that basis would send a message to both the public and the legal profession that this Court subscribes to the adage that "it's better to be lucky than good" when it comes to wrongfully borrowing funds from an attorney's trust account. As the Court noted in its questions during oral

33

argument, the client could have been harmed.  We do not find that Mr. Silbiger's significant

mitigating factors justify imposing a sanction less than disbarment here.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST CLIFFORD BAER SILBIGER.**

Judge Harrell joins in the judgment only.